The last case on for argument this morning is Sherwin-Williams Company v. JB Collision Services, Cases 1-6-56566 and 1-6-56588. So if you can come forward on that. Before we start the clocks, I have just a couple of questions of counsel. So each side's got 20 minutes and it looks like we've got, well I guess we sort of have, we've got two cases and we've got both counterclaims as well. So it would seem that you each probably have a little rebuttal time. Is that my understanding here? Cindy, if that's how you want to do it, you're absolutely welcome to do it as a standard appeal. I was envisioning about 15 minutes or so and then hearing the argument of Sherwin-Williams and then seeing some time for rebuttal because the two issues are so intertwined. They are, they are, but I just want to make sure. So even though, I mean, I guess I'll make sure that, I don't want to go back and forth and back and forth and back and forth, but by the same token, it would seem that you might each have a little rebuttal time. So, but you each have one counsel arguing for each side. Is that correct? And then I have one other really hard question that, how do we pronounce Mr. Tishke's? That would be just the way it's spelled wrong. Tesca. Mr. Tesca. Mr. Tesca? Tesca, like Fresca? Okay, Tesca. Okay, thank you. It's actually president court. Okay, thank you. All right, so let's proceed with, I guess, so your counsel for Mr. Tesca. All right, so it would sort of make sense that I think you go first. All right, so if you would approach the podium, state your name for the record, and tell me how you want to use your time. Thank you. Thank you, Your Honor. May it please the Court, Paul Sorrentino Jackson Lewis on behalf of the defendants and cross-complainants, that would be J.B. Collision and, excuse me, and J.J.T. and Mr. Tesca individually, who I indicated was president court. I would like to try to reserve at least two minutes, but hopefully five minutes, at least two minutes. Okay, well, watch the clock, but I'll kind of, I may alert you if I'm not otherwise engaged. Yes, Your Honor. This case, I think, is unique in the sense that the last time the Ninth Circuit, it appears that the Ninth Circuit addressed a matter like this was in 1997 with the central office telephone case. But then the Hetzel case came about in 1998, and since then we've had some other cases. So in short, in brief, on this particular matter, the issue that we're here on is the denial of a motion for a new trial. This is a case in which Sherwin Williams sued my client, and then we counterclaimed, and we, our counterclaim was based on, and we proved to the jury. And just so the Court's aware, because I don't think it's clear in the record, we had six judge Burns require that the alternate become part of the jury for purposes of deliberations. And so we had seven members deliberate, and all seven came to a unanimous verdict on the issues that we're about to discuss. That's important because at the end of this case, at the conclusion, Sherwin Williams asked, questioned the jury's verdict and asked that the jury retire back to the jury room, all seven of them, to look again at the amounts that were awarded to my client, the $750,000 for fraud and the $1.25 million for intentional misrepresentation and the $1.25 million for the negligent misrepresentation. They came back and they affirmed unanimously that that was the verdict. Those were the amounts for each of those claims. Then they were polled, and all seven agreed that they, this was their verdict. This gets to the heart of the case, because ultimately, Judge Burns, in our opinion, nullified the verdict of the jury even after that occurred. So we have to look back at the words of the Seventh Amendment. And without reading them, unless we need to do that for the record, essentially the Seventh Amendment prohibits the court from doing a reexamination of a jury's determination of the facts, which includes the extent of the plaintiff's injury. And that law comes to us from 1889 in the Kenmore v. Gilmore case, U.S. Supreme Court. From then to now, we've had several cases, not too many on this issue, but several central office being one, which is distinguishable from this case, I can explain. Central office having to deal with a lost profit case had an expert testify. And the court, as a matter of law, in that case, found that there was no evidence at all to sustain the expert's opinions because the expert admitted that he had made assumptions. That's not the case here. We produced evidence, so much evidence, in fact, that the court found in our favor on the fraud and the intentional and the negligent misrepresentations. And that's a major difference. In addition, the Hetzel case then came out the year after the COT case, I'll call it. I have a question about the double recovery on fraud. If we would agree with you that we should uphold the jury's verdict, my question would be, wouldn't we be upholding on the $1.25 million twice? And the answer to that is no, because the fraud and the intentional misrep and negligent misrep are completely separate. And we addressed this in the Court while the jury was actually out re-deliberating. We have fraud because two days, these are the records we got and we produced. I can give you the excerpts of record number. But two days before Mr. Teska entered into his contract, we have what they call a PQR, product quality report, in which a body shop in Orange County, California, had dieback, not on one or two cars, but according to Sherwin-Williams itself, its all of the cars. They never told Mr. Teska about that. Their product was defective before he purchased, before he was locked into this long-term exclusive contract to buy a defective product. I understand that. The intentional misrepresentations occurred later, as Mr. Teska testified. Well, wouldn't your argument be a little better if it was not the exact same amount on both? Which is why the jury was set back. Well, let's start with my question. Yes. If they were different amounts, wouldn't your argument be a little stronger? Wouldn't you be telling me that? No, I would not. Oh, you wouldn't say, okay, it's not double recovery because look, Your Honor, they're two different amounts. So the jury clearly was looking at two different. Oh, if I had the opportunity to do that, I would. Yeah, it would be a better argument. But it would be a better argument. I'm not saying you fail, but I'm just saying, would that not be a better argument? It certainly would be. But, Your Honor, the jury came to a conclusion, and this gets us back to what Judge Burns did. What identifiable amount was indicated by the jury in their verdict that would lend itself to a decision being made by the judge as a matter of law? Okay, when you argue the case, you ask for what, like $20 million? Correct, Your Honor. Based on what, 2,000? No. 10,000 cars at $2,000 per car, right? Actually, Your Honor, we asked for, the total was $3,200 per car times 10,000 cars, all of which had dieback. That was a testimony. That's the evidence. It actually comes to $32 million. $32 million. We, my client on the stand, was asked by the other side, and he said $20 million. But that doesn't, we weren't counting cars, and that's the fallacy, the problem with this case. Judge Burns did a remittitor, and he counted cars. We never counted cars. How much did the jury give for the fact that Sherwin-Williams destroyed the last remaining cans of paint to prevent my client, my client's expert, from testing them? That's a stipulated fact, read to the jury in voir dire, read to the jury in closing. How much for that? How much for my client's distress, financial but mostly emotional distress? We have evidence and testimony about how Sherwin-Williams was causing him this distress, and because they weren't paying for the warranty work, and he was paying out of his pocket. How much for his reputation? If we argue that there's sufficient evidence to support the verdicts, then we don't need to reach the Seventh Amendment issue, do we? That's correct, Your Honor. That's absolutely correct. And our request would be just to remand this back to Judge Burns with the simple question of what portion of this verdict shows any identifiable amount? Now, I will tell you it's in the record, but it's not argued, but it's in the record that both sides did submit special jury verdict forms. I think between the two of us we had 80 pages, and of course— But the jury didn't say the basis of—all right. If the damages are exactly the same but it's two different theories, then it's double recovery. There's case law to support that, correct? But there are two different causes of action, not theories. Two different actions, conduct. We had, for instance, the sales— But we don't know what conduct. We don't have any special verdicts, right? Correct. It's a general verdict. We have people on the ground who were, for instance, testimony about Jose Garcia and Hillary Castro, who told my client, well, we think that there's—you're the only people who have this problem. Okay? That's a negligent misrepresentation because they didn't know. But when he met with Kurt Hammond, the vice president or the regional vice president, he told them that, oh, we're looking into this. We don't know of anybody else who has this problem. But he had the particular specialized knowledge of knowing what was in our Exhibit 570, all of their internal documents. And by the way, it's not all. It's just that's what we put together. We only had—I don't know if the court knows this, but the judge allowed us each 10 hours to try the case. So we took a big body of documents and we made it into whatever Exhibit 570 is. Kurt Hammond knew because he was involved. As a matter of fact, in Exhibit 570, Kurt Hammond knew, at the time he met with my client, that Sherwin-Williams—it's one of the last pages. It was on—it was July of 2012, where Sherwin-Williams actually tested this paint in their laboratory and painted some substrates. Okay, let me— And it died back. All right, all right, all right. That's the next— We're not making— the duplicative damages. What, in the evidence that the jury had, what would be a way to say they're not duplicative, even though it's the exact same amount? What I was explaining. We have people making negligent misrepresentations to Mr. Teska, and we have higher-ups in the company, including the vice president of the whole company, Mr. Soule, who actually comes to San Diego and meets with my client, and he knows what the results are, and he lies about them. There's a difference between not knowing and making the negligent misrepresentations and knowing what's in them. And then the fraud is different because they knew, before he even entered into the contract, they had problems and they had complaints. And incidentally, one of the documents in the 570, it's within a—I think it's a page or two before the July of 2012 lab results, they actually try to fix, internally, without telling anybody, try to fix this defective product and then get comments within 20 minutes. It says— Well, let me ask you this then. It's diabetic. If you argued for $32 million or $20 million or whatever, and they had entered $20 million or $32 million on each of these, exactly what you asked for, would then you be entitled to $64 million or $40 million? Is that your argument? We wouldn't have done that because that was the total. I don't see how they could have done that. And if they had done that, I think that would have been a problem. We didn't ask for that. However, the reputation—we had reputation evidence. So how much did they give for that? So what did you tell—I know, but you said use your common sense, right? Oh, I did. For reputation. I did. Okay, so how do we know that common sense is worth $1.25 million and the DIABACs are worth $1.25 million too? And we don't because it's a general verdict, which is why Judge Burns couldn't do what he did. He can characterize it all he wants. The Minks case tells us this. He can characterize it all he wants as being a matter of law, but that's not true. And I want to draw the Court's attention to something the judge said on the record. It should be ER-579, if my memory is correct. And it is. And it says on ER-579, lines 16 through 19, Judge Burns said this. I have the option to see what a reasonable jury would do. And we had seven out of seven. And if it doesn't comport with my view of the evidence, then I can always reduce it by remitter. He's not permitted to do that without giving us the option of a new trial on damages. That's very simply what we asked for. But he said it himself, his personal view of the evidence. It wasn't as a matter of law. He tried to couch it with that in his order. But it's not as a matter of law. Simply is not. He looked at the evidence. And then I don't ‑‑ I can't answer this. Judge Palahniuk, I can't answer this. But I can tell you this. He counted cars. Why did he count cars? I didn't ask the jury to do that. That wasn't what the jury instruction said, jury instruction number 36. It's for all harm caused. That's what it says. And jury instructions 27, 28, and 29 on the fraud, the intentional infliction, the negligent infliction, all say the same thing, for all harm caused, that we have proven. That's up to the jury. We chose a jury trial. We went to trial. The jury spoke. And then Judge Burns counted cars. He didn't have the right to count cars. What he had the right to do, if it was as a matter of law, is look at some identifiable portion of the verdict form, and there is none, to say as a matter of law, you don't get this. Okay? And the cases are replete with that. And this is not a punitive damages case, so we don't have to worry about the 14th Amendment. Okay. And what I'm referring to there is the case law that Johansson v. Combustion Engine indicated in 1999 at 11th Circuit, but then was quoted in the Minks case. It says there are two types of legal error that permit reduction of a jury award without the offer of a new trial. Number one, the portion of a jury verdict is for an identifiable amount that is not permitted by law. We don't have that in this case. And number two, punitive damages due process. We don't have that in this case. The parties agreed to a general verdict. The verdict was simple. And that's what the jury made its decision on. So it's impossible, legally or factually, for Judge Burns to have excised any part of those verdicts. He, you know, Sherwin-Williams clearly doesn't like our, the evidence we presented, and maybe other people don't. But the jury did, and I tried that case with the jury. Okay. Do you want to reserve? Because I think you're covering some of the same ground. Yes. So I think it might be. You have one quick question, counsel. Could you, the passage you read, I think you said ER 579? Yes. Can you point? I've got it in front of us. We'll make sure I know the passage. Could you point me to? Yes, Your Honor. Let me pull it back out. It's 579. It is lines 16 through 19. Gotcha. It starts with the word but. Gotcha. Thank you. Okay. Okay. Thank you. Okay. I would like to reserve the rest, unless there's questions. Well, I think it might be helpful if we drill down on the other side, and then you have time to respond. I think that might help us. Thank you, Your Honor. Thank you. Good morning. Good morning, Your Honors. John Taylor from Horvitz and Levy for Sheridan Williams here. Before I get started, I think I'd just like to address a couple questions that came down about, you know, was there a duplication between what the jury did? And I think the implication from that suggestion might be that the Court is thinking of, you know, directing that a new judgment be entered for a specific amount. And I think, Your Honor, that that approach is precluded by a case from this circuit, Freund v. Nycomed. That's 347 F. 3rd, 752, and at pages 764 through 65. It's a situation like this where the Court had before it both a new trial motion and a JMOL motion. The Court in that case ruled on the JMOL motion and then didn't reach the new trial motion, just as Judge Berns here said that the new trial motion was mooted by his ruling on JMOL. I mean, I guess that's the question that sort of bothers me. The record contains statement from Testa and his associates that they painted about 10,000 cars with Sherman Williams paint, and that almost all of them experienced dieback. Why isn't this sufficient evidence of prospective damages?  Good question, Your Honor. Let me just finish the thought on Freund, which said the Court needs to send it back for the Court to do its job on the new trial motion. So if this Court believes JMOL was entered erroneously, the case needs to be sent back to Judge Berns to decide whether in the alternative he would grant a new trial rather than JMOL. But he basically said there wasn't sufficient evidence that it was speculative on the prospective damages, right? But if we look at the record and say, yeah, there's, you know, I mean, I don't know. What more could someone do in terms of they give you 100 cars and they say that this is what happened. They tell you how many cars that they did. They have testimony that practically everything had dieback. And I don't know how anyone could have a good reputation if every car that you do has dieback and they have to bring it back. So it would seem to me that, you know, they obviously don't have to call all 10,000 people to have sufficient evidence. And there's always perspective is speculative and not having an exact amount are two different things. Because the jury was instructed that it did not have to prove the exact amount of damages and must determine damages that will provide reasonable compensation for the harm. Why isn't the 100 redos a reasonable compensation for the harm that he suffered and then the other evidence along there? Why, when you put all of that together, why is that speculative, like Judge Burns said? Judge Burns had two powers here. He had the power to rule on JMOL, which is to find there was no evidence to support prospective damages. And then he exercised that power and granted JMOL. But he had a different power too, which is the 13th juror power, which he could have exercised to find, even if there's evidence sufficient to support this, a smidgen of evidence, I think it's not supported by the evidence. And as the 13th juror, I think they awarded too much money here. And I think there has to be a remediator with a chance to accept it or not accept it in a new trial. So Judge Burns did not exercise that second power. And if you decide that he was wrong on JMOL, judgment is a matter of law, then it needs to be sent back to him to give him the chance to take that second look as the 13th juror and decide whether this amount was excessive in his view as the 13th juror presiding over this case. So this Court, if it decides JMOL can't stand, it needs to send it back to him for another look on whether there should be a new trial based on that. I'm glad you raised that because I've struggled with understanding when Hetzel applies and when it doesn't. So maybe you can help me out here. So if a judge says, I find as a matter of law there was insufficient evidence of this, then you would say Hetzel does not apply, correct? Correct. The dividing line is whether the judge finds there's evidence to support liability or not, or whether he's saying, yes, there's liability, but too much money was awarded. And Hetzel actually makes that distinction. It cites the earlier case, Neely. In its decision it said, in Neely we decided there was, in a situation where there was no liability, then the judge can enter JMOL for a partial amount. But if the judge says, well, there is sufficient evidence of liability, but the amount is too much, then he begins to exercise that power as a juror, and he cannot enter JMOL. It has to go back for a new trial. And so what happened in this case? So now walk me through this case, what happened. Okay. So in this case, the judge looked at the different elements of damages. There were past repaints that had to be done. There were some cars waiting to be repainted. There was, you know, a set amount for those two sets of damages. But then there was some prospective amount, prospective injury for cars that had to come back and be repainted. The court looked at California law, it's the Greenwood decision, which says for those kind of prospective damages there's a reasonable certainty requirement. And reasonable certainty requires more than just the prospect that some cars are going to come back with a complaint. It requires that there be a showing about how many cars are going to come back and how many people are actually going to sue to enforce those rights to get their cars repainted. And under Greenwood, the court said there's nowhere near enough evidence to meet that standard for two reasons. First, there's no showing about what percentage of these cars is ever going to come back, because in the past nobody else has come in and asked for their car to be repainted. There's been some repainting because Mr. Teska, when cars came in, said, hey, your paint job is looking bad, I need to repaint that. But nobody came in, there's no evidence that anybody ever came in demanding a paint job. So in the future, no evidence of the fact of people coming back to get their cars repainted. In fact, Mr. Teska's theory was for damages, I want to go out, I want this money so I can go out, call people, invite them in, look at their cars, and then tell them they need a new paint job, and then I'll repaint their cars. Was there any briefing of Hetzel that, the way you've just framed it, was there any briefing of Hetzel before the district court? Hetzel was not called to the, well, I'm not sure, I don't believe in their briefing they called Hetzel to the court's attention. They might have. But the law of the circuit, I think central office is a case just like ours. We have this prospective injury claim under Oregon law, and the court said, you didn't prove prospective injury to a reasonable certainty, as Oregon law requires. And so the court said, for your prospective injury portion of the judgment, we're going to grant judgment as a matter of law, and we're going to cut that out. The Ninth Circuit affirmed that. That's directly on the point. All right. But if we say that, okay, that there was sufficient evidence that the court erred on that, so then you're going to say, send it back, and then sit as the 13th juror, and then are you going to make the exact same argument, and then Judge Burns is going to come up with his 100-redo argument? Is that, I mean, what is the right amount of damages? What should it be reduced to? It should be reduced to the amount that Judge Burns reduced it to, because you really get. . . So you're just going to make the exact same argument to get to the same place? He said that's one of the reasons he granted JMOL, because he said there's no proof that they can put on to meet the standard under Greenwood. And therefore, if I granted a new trial, he said at one point in one of his orders, then we were just going to reach the same place, which is about $600,000 of damages. But if you're going to give them some money, if you think there was proof of some prospective injury and they're going to get another bite of the apple on that, then there has to be a new trial, because Judge Burns, well, at least Judge Burns has to have the chance to decide whether there should be a new trial before any of that amount is reinstated. Well, so why can't Tesco recover for reputational harm? I mean, there's evidence. . . The evidence at trial showed that he painted approximately 10,000 cars with Sherwin-Williams AWX system. Almost all of them experienced dieback. The ones with dieback were rebuffed and repainted at no charge to the customer, and over 100 cars were repainted due to the dieback. How does that not leave approximately 9,000 cars painted to Sherwin-Williams AWX system that have yet to be repainted? So then you're going to go back and make the same argument, and he's going to do the same thing, then we'll be right back here saying that he's still overstepping as the 13th juror. Well, first of all, Your Honor, again, I think . . . I mean, Judge Burns seems to have an idea about how this should have come out. Judge Burns found correctly that there was no evidence of reputational harm presented. Well, how can that be? Because reputational harm . . . I mean, how do you . . . It would require some kind of showing that before he started using this paint, he had a certain reputation in the community, and after he began using this paint, he had a different reputation in the community. But isn't that kind of implicit, though, in a case like this, where you're the guy who guarantees a good paint job, except all of a sudden it's a bad paint job? I mean, who would go back to that man? Yeah. I mean . . . There has to be some evidence from somebody saying Mr. Teske's reputation in the community has gone downhill. Even Mr. Teske did not say that. There was a single email in which he said to Sherwin Williams, my reputation is at stake here. But there was no evidence that that harm to his reputation ever came to pass, no showing that before he began using the paint, he was making a certain amount of profits, and afterwards it declined by some amount. But he lost money with all the 100 diebacks, right? That when they rebuffed it and did it again, they didn't charge the people again, right? We don't know that. We don't know. There's no evidence. There was no documentation for the 100 redos, so we don't know if that was reimbursed by insurance companies. We don't know what amount. In fact, part of our cross-appeal is that because there was no documentation, Mr. Teske, before trial, his attorney said, we're not putting in a claim for that amount of damages because we don't have any documentation for it. During discovery, they disavowed those damages, and right before trial in response to the motion to eliminate, they also disavowed those damages. Well, as I read the record, there was another body shop owner who testified that had experienced the same fraud and deceit from Sherwin Williams, and thereby his reputation was ruined, and there was a loss of income, a loss of customers, and the like. Why wasn't that sufficient evidence? That didn't apply to Mr. Teske. That was a fellow who had a company called Bumper Doc, and he did not testify about Mr. Teske's loss of reputation or that there was any similar effect for him. And Mr. Teske really showed there was nobody who came back to him complaining about dieback except one Jaguar owner who showed his cars at car shows and had a particular sensitivity to the shine on his cars. But there was no evidence that anyone else came back in and said, my car looks bad, I want you to repaint it. There's just not a single witness who came in and said that. Well, okay. The jury verdict that you sent, I mean, the jury charge said that it was for all harm, right? And that's what everyone agreed on. And so we can't object to that right now. That's what they were told. So all harm could have included perspective damages. It could have included reputational damages. It could have included a lot of different things. And if we believe that there's something that supports that, isn't that enough? No, Your Honor. If you look at that instruction, jury instruction number 36, when it talks about all harm, it goes on to define what it means by that. And it says in the third paragraph of that instruction, fourth paragraph of that instruction, to determine the amount of damages, you must determine the market value of what JB Collision Services and JJT gave and subtract from that the amount of fair market value of what they received. That instruction had nothing to do with reputational harm, with emotional distress harm. Those claims were never in this case. They've been manufactured for appellate purposes here. There was no mention of reputational harm in the closing argument, no mention of emotional distress harm in the closing argument. The words emotional distress don't appear anywhere in the case until the appeal has begun. Well, what about emotional distress? He testified he and his associates were embarrassed, upset and nervous about the dieback issue. The jury apparently believed their testimony. Why isn't this sufficient? He didn't testify that he had emotional distress. He said that he had sent an e-mail in, I think, 2013 to Sherman Williams saying he was losing sleep over whether cars were going to come back. He never said that that was actually true. It could have been posturing for Sherman Williams' purposes. And that was the sole piece of evidence, the sole piece of evidence in the case about Mr. Tiska having emotional distress. There was no emotional distress instruction to the jury, no argument about emotional distress, nothing in closing argument referencing emotional distress. This is simply something that's been injected into the case after the fact to avoid Judge Byrne's proper JMOL ruling that this prospective damages theory really was not proven. There's nothing also to show that this emotional distress met California's seriousness requirement. The idea of losing sleep is not sufficient to meet California's requirement on that. There's a number of cases saying it has to be more than lost sleep and general anxiety. You have to have something so debilitating you can't continue in your normal life functions. There was no evidence of that kind of emotional distress here. Counsel, what is your definition of all harm? The definition of all harm here in this instruction has to be read in the context of what claims were presented to the jury and what evidence was presented. And in the instruction itself, it makes pretty clear we're talking about damages that are measured by market value, and that has to do with what injury did Mr. Tiska suffer in the marketplace. Well, it's not really clear because you were not counsel in trial, correct? I was not counsel in trial. And they weren't consulting you at that point. And everyone agreed on all harm. And they talked about all of those things. And there were no special verdicts. Even everyone agreed that they didn't do all of those, and the jury came back. So why do you get to parse it up here when that's the way they did it down there? You're saying he's coming up with this here. Why do you get to do that? He doesn't get to do it. Why do you get to do that? I'm just looking, Your Honor, as you will do also and your staff, at what evidence was presented of these particular claims of injury. This was a case about repainting cars. This was not a case about emotional distress. It wasn't even a case about reputational injury. But even if there was some evidence that you could infer a reputational injury from the use of this paint, the fact of the matter is that there was no evidence that would allow anyone to quantify what that damage was. And that's what Judge Burns said was the real problem here. And there's a case that they cite in their brief I'd urge you to look at. Let me see if I can find it here. It's Lysudyne v. Cedar Sinai. It's 3 Calab 5, 881. At page 887, the court says there, merely showing the fact of damages is not sufficient for anyone to infer an amount of damages. And that's what we have here. We have tiny little bits of evidence saying Mr. Tiska felt like his reputation was at stake, but no evidence from which the jury could come to any conclusion about to quantify what that damage was. How many of these cars are ever going to come back for repainting? What effect in the community this supposed loss of reputation was causing? Dieback is an issue that doesn't cause any injury to the car. What did the trial lawyer representing Sherwin-Williams argue that the damages were? First saying, I guess, because you won on the contract part of it. Correct. All right. But then after that, I'm assuming that counsel would have argued something to the effect of if you don't, you know, if you don't agree that, you know, that this is how I would count, this is what all harm means. What did they argue? They argued 30 million or 20 million or whatever, 32 million, 20 million. All the arguments focused on are any of these cars going to come back for repainting? There was no discussion by either side about emotional distress damages. That wasn't even in the case. Or this idea of loss of. But did Sherwin-Williams lawyer in the trial court argue that they were limited to the 100 cars? Did they make that argument? Or what did they argue? They said there was no, no. They said the 100 cars were not even in the case. The 100 cars had been disavowed before trial. So no one was arguing about the 100 cars. That had been taken out of the case by a pretrial ruling. As to other cars coming back, the argument was on Sherwin-Williams side, there's simply no evidence these cars are going to come back because there's no evidence that anyone in the past has complained about cars coming back or cars having died back. So nothing by which we could predict them coming back in the future. And the judge pointed to that. He pointed to the absence of evidence on a number of different theories that they could have put in evidence. But I guess it's just, okay, I'm just wondering in terms of, obviously they argued for the moon. You argued for zero. And the jury didn't buy what either of you said. And they went back and decided what they thought all harm was. And they were given all of this. So why doesn't, you know, you had a jury trial. Why doesn't that stand? Because the evidence did not meet the standard under California law set forth in Greenwood and any number of cases afterwards that have cited that case and the preceding Supreme Court cases that say you have to establish reasonable certainty of these respective damages. And there was no evidence, as Judge Burns correctly found, there was no evidence of reasonable certainty that any cars were going to come back, much less $2 million worth of cars to be repainted. The entire damages. Do you want to save a little time since I think you were going back and forth on that? I think since we're not really reaching the 100 reduce issue here, I'll stick with, finish up my argument. Okay. There was no evidence to show that the Greenwood standard was met. And because that claim for prospective damages was legally invalid, the judge was able to identify that particular claim, excise an identifiable portion of damages out of the case. He exercised authority he had under the central office decision, also under the Leatherman case that followed Hetzel, and then another, you know, unpublished decision from this court. The law of the circuit is the judge has this power when there's a defective item of damages and it can be identified what the amount is to excise it from the judgment. And the court here properly exercised that power under the law of the circuit. And the judgment notwithstanding or judgment of a matter of law ruling should be affirmed. If it's not affirmed, it needs to go back to Judge Burns to decide whether he would exercise his power as the 13th juror to order a new trial, to remit the damages to a certain amount and ask the other side if they want to accept that or whether they want to have a new trial. Those are the only two remedies. This court should not direct that some amount be entered other than to affirm the judge's matter of law ruling and the judgment Judge Burns entered. It must send it back to him for a new decision on whether there should be a new trial. If that's the route the court wants to take. All right. Thank you. I'd like to just three quickly, three of the points. I think it would help us if it would certainly help me. I can't speak for everyone else, but it would help me if, if you were to prevail on reversing saying there was sufficient evidence, it would have to be remanded. So what's your argument at that point? To Judge Burns? Yes. Very, very simply, Your Honor, I will, I would point to the record at ER 580 where Judge Burns himself said there's some evidence of, sorry, he's testified about loss of reputation. There's been some evidence that turning out cars where customers aren't satisfied and the shine goes away right away. It's going to reflect negatively on his business. That's a matter of for the jury to consider as a matter of damages. So I say to Judge Burns, where's my reputation damages? You said I proved it. He said I did that, and I did do that. So where is that in his remand? It's nowhere. He completely discounted it. That's where the issue is. Well, okay, but that's all right. That's why you prevail on, if we were to determine that Judge Burns erred, I'm just saying this hypothetically, if we were to determine that he erred in saying that there was no evidence to support the verdict, then he gets reversed. But what counsel for Sherwin-Williams is saying is, but the judge didn't rule on the second motion, and so it has to go back on that. And it does have to go back, but what we ask for is the right to a trial, a new trial on damages. You know, Judge Nelson. Well, you would get that if he reduced it again on remediator. You would have the choice of do you retry it or do you take that. Correct, Your Honor. And I will tell you right now that what our preference is is not to continue the legal proceedings. It's to ask this Court, and I don't think this Court has the authority to do it, but they say reinstate the verdict because the truth of the matter is justice delayed. It is justice denied in this case because people are coming in with their cars. They're being fixed. The warranties have all been denied. And so my client is suffering. But I just picked up something you said. What we would like you to do is something you don't have authority to do. I'm not sure that's a deal. That isn't okay. That's never a good thing to ask a court. No. You know, we don't like to act without authority, so that's. I believe that you can remand this case to Judge Burns and say, Judge Burns, look at the Hetzel, look at the case law after that, and tell me, how did you excise even one penny from these verdicts? Because there's no identifiable amount. Okay, no, that's very helpful. I have the same concern Judge Callahan does. So it's one thing to come into court and say, Ninth Circuit, reinstate damages of $20 million or $10 million. You're not asking for that, correct? Well, I am. I'm asking for the $3.25 million to be reinstated, but in the alternative. Okay, what's the authority? Okay, stop right there. What's the authority for us to do that? Give us a case that says we can do that. I am looking at the Minks case, which says that the trial court has to look at an identifiable portion of the verdict in order to excise any part of it. But asking this court to reinstate. I don't. You know, it's just like Hetzel. I don't believe this court has ruled on a case similar to this since the central office telephone case, and Hetzel came out after that. And I think that this court should use equitable powers at this point to go back and say, reinstate it, or show us what it is that you excised and how you came to that. I was going to say, because there's another point that was raised on the emotional distress issue, ER 563. We have, of other testimony, we have this testimony that the jury heard. Okay, do it quickly because you're going into overtime. I'm sorry. This is, he was asked, why do you want this money? This is not a Greenwood case because no one's suing. He is going out and bringing these customers in to fix their cars, and he has been doing that. He was doing that at the time, and they knew it. And he said, this is my life. I'm building my business for my son. I need to call those people. I need to get them back in and get their car fixed, but I can't. I can't afford to do it. They're breaking me. They're doing exactly. They're breaking me. They're taking me down financially. I can't even afford to pay my lawyer. That's the testimony the jury heard, among other testimony concerning the distress and all of the other issues that all harm cause encompasses. Okay, I think we understand your argument. All right. Thank you. Thank you, Your Honor. Thank you both sides for your argument in this matter. This will stand submitted. This court is in recess until tomorrow at 930.
judges: D.W. Nelson, Callahan, Owens